```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
```
PAUL FABOZZI and ANNETTE FABOZZI,

                 Plaintiffs,                 **MEMORANDUM and ORDER**

      — against —                            04-CV-4835 (SLT)(RLM)

LEXINGTON INSURANCE COMPANY;
JOHN DOES 1-10 and ABC CORPS. 1-10,

                 Defendants.
```
----------------------------------------------------------------X
```
**TOWNES, United States District Judge:**

      In October 2004, Paul Fabozzi and his daughter, Annette (collectively, "the Fabozzis" or "Plaintiffs"), commenced this diversity action, alleging that defendant Lexington Insurance Company ("Defendant" or "Lexington") breached the terms of a homeowner's insurance policy covering the Fabozzis' home in Staten Island by failing to pay for property damage that was discovered on or before May 13, 2002. Lexington now moves for summary judgment, principally arguing that this action was filed more than two years after the "date of loss" and is, therefore, barred by a two-year limitation period set forth in the policy. Although Plaintiffs contend that the limitation period did not begin to run until all conditions precedent to recovery under the policy were satisfied and that Lexington should be estopped from enforcing the limitation because Plaintiffs' insurance broker assured them that Lexington would pay their claim, this Court concludes that this action is time-barred. Accordingly, Lexington's motion for summary judgment is granted and this action is dismissed.

***BACKGROUND***

      Sometime in the early 1990's, Paul Fabozzi and Annette's former husband, James D. Gavrity, purchased a wooden-framed waterfront home at 140 Nicolosi Drive, on the southeastern

shore of Staten Island, for approximately $1.5 million (Plaintiffs' Response to Moveant's [sic] Statement of Facts, dated Sept 5, 2006 ("Pl. Resp.") at ¶ 19; Defendant's Response to Plaintiffs' Counter Statement of Facts ("Def. Counterstatement") at ¶ 19; Declaration of Brian J. Bolan, Esq., in Support of Defendant Lexington Insurance Company's Motion for Summary Judgment ("Bolan Declaration"), Ex. H at ¶ 15, and Ex. K at 10, 65). That purchase was financed, at least in part, by the former owners, Francis and Marguerite Coppa (collectively, "the Coppas"), who then took a mortgage on the property (Bolan Declaration, Ex. H at ¶¶ 8-15, and Ex. K at 10). Under the terms of their agreement with the Coppas, Messrs. Fabozzi and Gavrity were required to maintain insurance on the property (Bolan Declaration, Ex. K at 66).

To obtain the required insurance, Mr. Fabozzi contacted the Welsh Agency, Inc. ("Welsh"), a Staten Island insurance broker with whom he had dealt in the past (Bolan Declaration, Ex. K at 63). According to Mr. Fabozzi, insurance companies were initially eager to insure the property, but proved reluctant to insure the beachfront property for long (*Id*. at 64-66). As a result, the property was insured by a series of companies before Lexington became involved (*Id*.).

At some juncture, Welsh obtained insurance for the Fabozzis through Lexington by contacting Quaker Special Risk, a company which specializes in obtaining insurance for those having "difficulty finding coverage" (*see* Bolan Declaration, Ex. C at cover page (entitled, "HO3 Homeowner Declarations Page"); http://www.qsr-insurance.com). The parties agree that during the period between April 1, 2001, and April 1, 2003, the property was insured by Lexington (Pl. Resp. at ¶ 5; Bolan Declaration, Ex. C). A copy of the Lexington homeowners insurance policy (the "Policy") is attached to the Bolan Declaration as Exhibit C.

2

For purposes of this opinion, this Court need not describe the terms of the Policy in great detail. It suffices to note that the Policy provided coverage "for direct physical loss to covered property involving collapse of a building or any part of a building caused *only* by one or more" of certain enumerated causes (Policy (HO 00 03 04 91) at 5 of 16 (emphasis added)).[1] These causes included not only common "Perils Insured Against" – such as fire, wind damage, explosions, vandalism and theft – but also "Hidden Decay, ... Hidden insect or vermin damage; ... Weight of rain which collects on a roof; ... [and] Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation" (*Id*.). However, the Policy disclaimed coverage for physical loss due to the collapse of a building or any part of a building due to causes other than those enumerated (*Id*. at 6 of 16). In addition, the Policy expressly stated that it did not insure for loss caused by, *inter alia*, "Wear and tear, marring, deterioration; ... Inherent vice, latent defect, mechanical breakdown; ... Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings" (*Id*. at 7 of 16).

The Policy placed certain duties upon persons seeking to make a claim. It required, *inter alia*, that "[i]n case of a loss to covered property," an insured "[g]ive prompt notice to [Lexington] or [its] agent" (*Id*. at 9 of 16). The Policy also placed a time limitation on lawsuits arising under the policy, stating:

> No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss.

---

[1] The Policy itself is comprised of 13 separate forms and endorsements, each of which is separately numbered. For ease of reference, this Court will identify the specific form or schedule in parentheses and provide the page number as it appears in that form or endorsement.

(*Id*. (HO 01 31 08 00) at 4 of 6). The terms "loss" and "date of loss" were not specifically defined in the Policy.

At some point between September 2001 and May 2002, the Fabozzis became aware that their waterfront home had serious structural problems. The parties disagree as to when these problems were discovered. Plaintiffs allege that in September or October 2001, they arranged to have a contractor make certain home improvements, including repairs to a window which did not close properly (Pl. Resp. at ¶8; Bolan Declaration, Ex. C, at 15-18). However, Plaintiffs claim that they did not realize that their home was on the verge of collapse until April 2002, after the renovations revealed the structural problems (Pl. Resp. at ¶21; Bolan Declaration, Ex. C, at 38).

Defendant, on the other hand, asserts that Plaintiffs knew of the problems as early as June 2001 (Def. Counterstatement at ¶ 21). In support of this assertion, Defendant principally relies on a letter dated June 21, 2002, from David L. Businelli, an architect, to Fred A. Barbieri, an engineer (Bolan Declaration, Ex. F). In that letter, Mr. Businelli states that, when "contacted in September of 2001 by the owner to design a small renovation project," he was "also made aware of some structural problems with the house such as sagging window headers [and] humps in the floors ..." (*Id*. at 1). Mr. Businelli further states that, "[u]pon visiting the house," he saw serious structural problems:

> I observed that the rear exterior wall at the 3rd floor was leaning towards the rear several inches. I also observed many cracks in the walls and that the floors were pitched towards the rear of the house. I also observed deterioration of the exterior walls conceivably due to water infiltration behind the EIFS cladding.

(*Id*.).[2] Mr. Businelli's letter implies that he informed the owner of the problems, stating that he

---

[2]EIFS – an acronym for "Exterior Insulation and Finish Systems" – is an exterior cladding system, commonly known as synthetic stucco. *See*, *e.g*., http://www.accuspec.biz/EIFS.htm.

"was retained in October of 2001 ... to identify the problems with the house and to rectify them" (*Id*.).

By mid-May 2002, the structural problems were so severe as to force the Fabozzis to leave the home. Plaintiffs retained counsel who, on May 13, 2002, wrote a letter to Quaker Special Risk, making a claim on Mr. Fabozzi's behalf (Bolan Declaration at Ex. D). That letter stated that the house at 140 Nicolosi Drive was "about to collapse due to hidden decay and other issues," and that Mr. Fabozzi was making a claim for coverage under the provisions of the Policy which insured against "collapse" (*Id*.).

According to Mr. Fabozzi, a Lexington representative visited his home on May 23, 2002 (Affidavit of Paul Fabozzi, dated Aug. 10, 2006 (Ex. A. to Declaration of Eric R. Breslin, Esq., in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Breslin Declaration")) at ¶ 9). Mr. Fabozzi recalled that the Lexington representative "assured [him] that his claim for damages would be covered under the Lexington Homeowner Policy" (*Id*.). However, Mr. Fabozzi also remembered that "the Lexington representative told [him] that the cause of the damage ... needed to be determined" (*Id*.).

Approximately two weeks later – on June 5, 2002 – Plaintiffs' counsel received a letter addressed to Mr. Fabozzi which undercut any assurances that Mr. Fabozzi may have previously received. The letter, entitled "Reservation of Rights" and written by a claims adjuster retained by Lexington for the purpose of investigating the cause of the "loss," stated, in pertinent part:

> Information thus far received regarding this claim indicates possible involvement of questions of coverage and/or violations of the terms and conditions of the policy of insurance that may have a material bearing on the insurer's liability in this matter. In order to resolve these questions pursuant to your request, ... and [sic] investigation will be undertaken and a final decision by the insurer will be deferred.

5

> Accordingly, all rights of the Lexington Insurance Company, under the policy or otherwise, are fully reserved.
>
> Nothing stated in this letter is intended nor should it be construed to be a waiver of any of the terms or conditions of the policy, nor a waiver of any rights or defenses available to the Lexington Insurance Company. They specifically reserve ... all such rights and defenses that are apparent or as they may become apparent.

(Bolan Declaration, Ex. E).

Although Plaintiffs acknowledge receiving the June 5, 2002, letter (Pl. Resp. at ¶ 24), they do not state what action, if any, Mr. Fabozzi or his attorney took in response to this letter. Defendant maintains that Plaintiffs never obtained, or even sought, "a waiver of the suit limitation provision contained in the policy ...." (Affidavit of Janet Leary, dated Nov. 30, 2004 (Ex. I to Bolan Declaration) at ¶ 6).

In August 2002, Plaintiffs commenced an action in the Supreme Court of the State of New York, Richmond County, against the Coppas and both an architect and an engineer involved in the construction of the home (Bolan Declaration, Ex. H). The complaint in that action alleged that "the [r]esidence was about to collapse, because of poor construction" (*Id*. at ¶ 18). Specifically, the complaint alleged that the subterranean pilings which were necessary to support the home over the marshy soil were "not constructed of concrete, but of wood," were not numerous enough to support "a structure the size and weight of the residence," and "did not reach the depth which was necessary to provide support for the residence" (*Id*.) Plaintiffs did not name Lexington as a party to the state court action, or pursue any other legal remedies against Defendant.

Before and during the pendency of the state court action, Ms. Fabozzi contacted Welsh on several occasions. According to an affidavit filed as part of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Ms. Fabozzi telephoned Welsh in May 2002, twice

6

in 2003 and once in 2004, and was consistently "informed and assured that [the] claim for damages" would be covered under the Policy (Affidavit of Annette Fabozzi, dated Aug. 10, 2006 (Ex. B. to the Breslin Declaration) at ¶¶ 4-6). Although the "Homeowner Declarations Page" of Plaintiffs' Policy clearly indicates that Welsh was merely a sub-broker (Policy at 1), Ms. Fabozzi recalls that Welsh claimed to be "a representative of Lexington," who "spoke on Lexington's behalf" (Affidavit of Annette Fabozzi, dated Aug. 10, 2006 at ¶ 4).

However, a supplemental affidavit filed by Ms. Fabozzi after the instant motion was fully briefed indicates that Ms. Fabozzi had ample reasons to question whether Welsh actually "spoke" for Lexington. In that supplemental affidavit, Ms. Fabozzi recalled the specifics of conversations she had with "Fran," a representative of Welsh, in which Fran repeatedly referred to Lexington as a third party. In the first of these conversations, which occurred in February 2003, an upset Ms. Fabozzi called Fran after learning that Lexington had cancelled Plaintiffs' Policy. Fran admitted to Ms. Fabozzi that she had called Lexington to report that the Fabozzis had moved from the premises because she had "a responsibility to inform Lexington" of this development (Supplemental Affidavit of Annette Fabozzi, dated May 29, 2007 (attached to Eric R. Breslin's letter dated June 8, 2007) at ¶ 5. Fran then reassured Ms. Fabozzi that the claim would be paid, telling her, "Lexington is a good company" (*Id*.). In May 2003, Ms. Fabozzi called Fran again, asking about the status of the Fabozzis' claim. According to Ms. Fabozzi, "Fran responded that she checked into it and told [Ms. Fabozzi] that they were still working on it" (*Id*. at ¶ 6).

In January 2004, Defendant deposed Mr. Fabozzi in connection with his claim (*see* Bolan Declaration, Ex. K). Although the deposition took place ten months before the instant action was commenced, the examination was nonetheless quite adversarial. Mr. Fabozzi was

questioned extensively concerning the date on which he first learned of the structural problems (Deposition of Paul Fabozzi, dated Jan. 7, 2004 ("Fabozzi Deposition") (attached as Ex. K to Bolan Declaration) at 12-39)). When Mr. Fabozzi testified that he had first learned of the problems in April 2002, Defendant's counsel – a member of the same firm that currently represents Defendant in this action – confronted Mr. Fabozzi with Mr. Businelli's June 21, 2002, letter, which implied that Plaintiffs had been told of the problems as early as October 2001 (*Id.* at 13). Plaintiffs' counsel was present throughout the deposition.

On March 29, 2004, the Appellate Division of the New York State Supreme Court dismissed Plaintiffs' state court action, *Fabozzi v. Coppa*, 5 A.D.3d 722, 774 N.Y.S.2d 555 (N.Y. App. Div. 2004), and granted Marguerite Coppa summary judgment in her action to foreclose upon the mortgage. *Coppa v. Fabozzi*, 5 A.D.3d 718, 773 N.Y.S.2d 604 (N.Y. App. Div. 2004). Exactly seven months thereafter, on October 29, 2004, Plaintiffs commenced this diversity action, seeking to recover money allegedly owed them under the terms of the Policy. Although Plaintiffs principally allege that Defendant "breached its contract with Plaintiffs by failing to [pay] Plaintiffs the amounts due and owing under the Policy" (Complaint at ¶ 21), Plaintiffs also allege that Defendant has breached "the implied covenant of good faith and fair dealing" by refusing to honor its obligations under the Policy. (*Id.* at ¶ 25).

Defendant now moves for summary judgment. Although Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Defendant's Memo") lists six points, this Court need only consider the first two. In those two points, Defendant argues that Plaintiffs' lawsuit is barred by the limitation provision contained in the Policy, and that Defendant neither waived that provision nor acted in a manner giving rise to estoppel. Plaintiffs counter by asserting that this action is not time-barred because the two-year limitation period did not begin

to run until July 2003, after the cause of the damage was determined, and that Lexington should, in any event, be estopped from enforcing the limitation because Welsh assured the Plaintiffs that Lexington would pay their claim.

## *DISCUSSION*

### *The Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)*; Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the non-movant cannot rely on hearsay testimony which would not be admissible if testified to at trial. *See*, *e.g.*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); Fed. R. Civ. P. 56(e).

### *Choice of Law*

In diversity cases, district courts apply the choice of law rules of the state in which the court sits. *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008). New York law "applies different choice-of-law rules for different types of claims." *State Farm Mut. Auto. Ins. Co. v. Liguori*, ___F. Supp. 2d___, No. 08-CV-967 (JFB)(WDW), 2008 WL 5204468, at *5 (E.D.N.Y. Dec. 12, 2008). In contract cases, New York employs a "'center of gravity' or

9

'grouping of contacts' choice of law theory." *Matter of Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 226, 597 N.Y.S.2d 904, 907 (1993).

In this case, the parties agree that New York law should apply to this dispute. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Memo") at 11; *see* Defendant's Memo at 5 (citing New York case law). This Court concurs. Although the Policy at issue does not contain an express choice of laws provision, it covers property situated in New York and contains "Special Provisions" applicable to New York real estate. *See* Policy (HO 01 31 08 00). Indeed, the two-year limitation period, which is central to Defendant's motion, is contained in this "Special Provisions" section. *Id*. at 4 of 6. Accordingly, this Court will apply New York law to this case.

### *Plaintiffs' Failure to File Suit within the Limitations Period*

New York imposes a six-year statute of limitations for plaintiffs seeking to file an action based upon an alleged breach of contract. N.Y. C.P.L.R. § 213(2). However, "parties to a contract may agree to shorter limitations periods, which are normally enforceable when they are reasonable and in writing." *Vitrano v. State Farm Ins. Co.*, No. 08 CV 103 (JGK), 2008 WL 2696156, at *2 (S.D.N.Y. July 8, 2008) (citing *John J. Kassner & Co. v. City of New York*, 46 N.Y.2d 544, 550-51, 415 N.Y.S.2d 785, 789 (1979); *see also Carat Diamond Corp. v. Underwriters at Lloyd's, London*, 123 A.D.2d 544, 546, 506 N.Y.S.2d 708, 709-10 (N.Y. App. Div. 1986). Limitations periods as short as twelve months have been enforced. *See, e.g.*, *Blitman Constr. Corp. v. Insurance Co. of N. Am.*, 66 N.Y.2d 820, 498 N.Y.S.2d 349 (1985).

In this case, the parties agreed to shorten the limitations period to two years. The Policy provides that "[n]o action can be brought unless the policy provisions have been complied with

10

and the action is started within two years after the date of loss." Policy (HO 01 31 08 00) at 4 of 6. Under New York law, the "date of loss" is the date of "the occurrence of the casualty or event insured against." *Lichter Real Estate No. Three, L.L.C. v. Greater N.Y. Ins. Co.*, 43 A.D.3d 366, 366, 841 N.Y.S.2d 93, 94 (N.Y. App. Div. 1st Dep't 2007) (citing cases). Although the parties do not agree on whether and when the Fabozzis incurred a "loss," it is clear that the loss, if any, occurred sometime prior to May 13, 2002, when Plaintiffs' counsel filed a claim on the Fabozzis behalf, stating that the house was "about to collapse." Bolan Declaration, Ex. D. Accordingly, under the terms of the Policy, any lawsuit relating to that loss had to be filed no later than May 13, 2004. Plaintiffs, however, did not commence this action until October 29, 2004, approximately five and one-half months after the limitations period expired.

In an effort to establish that this action is not time-barred, Plaintiffs first argue that the limitations period should run from the date "all conditions precedent to recovery under the policy were satisfied and a cause of action against the insurer had accrued." Plaintiffs' Memo at 17. Although Plaintiffs cite solely to Judge Patterson's 1997 decision in *Myers v. Cigna Prop. & Cas. Ins. Co.*, 953 F. Supp. 551 (S.D.N.Y. 1997), this argument is based on a line of cases dating back to the 19th Century. Under these cases, insurance provisions requiring that suit be brought within a specified time "after the loss or damage shall have occurred" were construed to mean that "the period of limitations was to be computed from the time the cause of action accrued rather than from the occurrence of the event insured against." *Proc v. Home Ins. Co.*, 17 N.Y.2d 239, 243, 270 N.Y.S.2d 412, 414 (1966) (citing *Steen v. Niagara Fire Ins. Co.*, 89 N.Y. 315, 323-24 (1882), and *Ames v. New York Union Ins. Co.*, 14 N.Y. 253, 264 (1856)). However, *Steen*, *supra*, expressly noted that the parties could agree "that the time of the fire should be

11

looked to as the event, from the happening of which the limitation should run," if they used "distinct language to show that such was the intention of the parties." *Steen*, 89 N.Y. at 324.

Following the Court of Appeals' 1882 decision in *Steen*, standard insurance policies were modified to contain such "distinct language." At first, the standard fire policy provided that an action on the policy had to be commenced "within twelve months next *after the fire*." *Proc*, 17 N.Y.2d at 243, 270 N.Y.S.2d at 414 (emphasis in original). However, by 1943, the insurance industry had expanded to cover risks other than fire. Accordingly, the standard policy was modified by replacing the phrase, "after the fire," with the phrase, "after inception of the loss." *Id*., 17 N.Y.2d at 243-44, 270 N.Y.S.2d at 414.

For some years following this modification, courts exalted form over substance and accorded untoward significance to the parties' decision to use or not to use the "inception" language in the policy. Courts held that periods of limitation commencing at "inception of the loss" began at the occurrence of the casualty or peril insured against. *See*, *e.g*., *Proc*, *supra*; *Marguiles v. Quaker City Fire & Marine Ins. Co.*, 276 A.D. 695, 97 N.Y.S.2d 100 (1950). On the other hand, limitation provisions that did not include the "inception" language were viewed as insufficient to establish an agreement that the limitations period begin at the occurrence of the casualty. For example, in *Parker v. American Sur. Co.*, 176 Misc. 985, 29 N.Y.S.2d 414 (N.Y. Sup. Ct. Monroe County 1941), the court held that a limitations period beginning on "the date upon which the loss or damage occurred" began when liability accrued. Similarly, in *Pichel v. Hanover Ins. Cos.*, 155 Misc.2d 746, 589 N.Y.S.2d 979 (N.Y. Sup. Ct. Onondaga County 1992), the court held that a limitation provision requiring that suit be "commenced within one year after the loss occurred" did not begin to run until the full extent of the loss was known. Indeed, *Pichel*

12

held that this limitation provision was inconsistent with another limitation provision in the same policy, which provided that the period of limitations began two years after "inception of the loss" and, therefore, started to run "from the date of the actual physical loss." *Id.*, 155 Misc.2d at 747, 589 N.Y.S.2d at 980 (citing *Proc*, 17 N.Y.2d at 243-45).

The case on which Plaintiffs principally rely – *Myers v. Cigna Prop. & Cas. Ins. Co.*, 953 F. Supp. 551 (S.D.N.Y. 1997) – was decided only five years after *Pichel*. In *Myers*, the limitations provision required that "any suit ... be commenced within one year of the date of loss or damage." 953 F. Supp. at 553. Reading this language in light of the cases which had been decided to that point, Judge Patterson held that Myers had one year from "the date Cigna's liability accrued" in which to bring his action. *Id.* at 556. Judge Patterson reasoned that the limitation provision in the policy was "similar to that in *Steen*" and did not "refer to the 'inception' of the loss or damage or to the 'event from which the loss or damage arises.'" *Id.*

In the years since *Myers* was decided, New York courts appear to have abandoned the rigid approach that underlay the ancient cases on which Judge Patterson relied in favor of a more flexible approach that considers the plain meaning of the contractual language. Under this approach, the term, "date of loss," is viewed as effectively synonymous with the phrase, "after inception of the loss." *See Costello v. Allstate Ins. Co.*, 230 A.D.2d 763, 763, 646 N.Y.S.2d 695, 696 (N.Y. App. Div. 2d Dep't 1996). As the *Costello* Court noted:

> Both phrases have consistently been held to refer to the date of the catastrophe insured against, and *not* to the accrual date of the plaintiffs' claim against [the insurer] for failure to pay.

*Id.* (emphasis in original)(citing cases); *see also Klawiter v. CGU/OneBeacon Ins. Group*, 27 A.D.3d 1155, 1155, 810 N.Y.S.2d 756, 757 (N.Y. App. Div. 4th Dep't 2006). Similarly, the phrase "date of loss" has been held not to refer to "the date of the completion of the process to

13

determine the loss." *Roberts v. New York Prop. Ins. Underwriting Ass'n*, 253 A.D.2d 807, 807, 677 N.Y.S.2d 621, 622 (N.Y. App. Div. 1998) (emphasis added). In light of this recent case law, this Court declines to follow *Myers*, and finds that Plaintiffs failed to commence this action within two years after the date of loss.

"Failure to comply with a contractual limitations period will subject a breach of contract suit to dismissal, unless the plaintiff can show that the suit falls within an exception to the limitations period." *Vitrano*, 2008 WL 2696156, at *2. If, for example, plaintiffs can demonstrate that they were "misled or lulled by the defendant into failing to bring the claim in a timely manner, the defendant may be equitably estopped from relying on the contractual limitations period." *Id.* (citing *Satyam Imports, Inc. v. Underwriters at Lloyd's via Marsh, S.A.*, No. 03 Civ. 4387 (GEL), 2003 WL 22349668, at *2 (S.D.N.Y. Oct. 14, 2003)). Similarly, plaintiffs can establish a waiver of the limitations provision by offering "evidence from which the defendant's intent to relinquish the protection of the contractual limitations period can be reasonably inferred." *Satyam Imports, Inc.*, 2003 WL 22349668, at *2 (citing *Gilbert Frank Corp. v. Federal Ins. Co.*, 70 NY.2d 966, 968, 525 N.Y.S.2d 793, 795 (1988)).

Although they do not assert that Lexington waived the limitations provision, Plaintiffs argue that Defendant should be estopped from relying on the contractual limitations period because, "[f]or more than two years after ... [the] May 13, 2002, claim, Lexington's agents assured Fabozzi that the damage was covered by the Homeowner Policy." Plaintiffs' Memo at 20. Motions for summary judgment based upon a plaintiff's failure to comply with a limitations period in an insurance policy will not be granted "if triable issues of fact exist to question whether the insurer made representations or engaged in conduct to mislead the plaintiff into believing that the limitations provisions would not be invoked." *Penna v. Peerless Ins. Co.*, 510

F. Supp. 2d 199, 204 (W.D.N.Y. 2007) (citing *Blitman Constr. Corp.*, 66 N.Y.2d at 823, 498 N.Y.S.2d at 350-51. However, in this case, Plaintiffs have not adduced evidence to establish that Defendant made any concrete assurances that misled them. To the contrary, the Plaintiffs' own evidence suggests that Plaintiffs had substantial reasons to doubt whatever assurances they may have received.

First, Mr. Fabozzi claims that he was "assured" by a Lexington representative in May 2002 that the claim would be paid. Affidavit of Paul Fabozzi at ¶ 2. However, Mr. Fabozzi himself states that this representative said "that the cause of the damage to the Residence needed to be determined." *Id.* Furthermore, any assurances made by the Lexington representative were undercut less than two weeks later when Mr. Fabozzi received a letter dated June 5, 2002, in which a claims adjuster stated that there were "questions of coverage and/or violations of the terms and conditions of the policy of insurance that may have a material bearing on the insurer's liability in this matter." Bolan Declaration, Ex. E.

Second, Ms. Fabozzi claims that she had several conversations with "Fran," an employee of Welsh, in which Fran assured her that the claim would be paid and claimed that Welsh "spoke on Lexington's behalf." Affidavit of Annette Fabozzi at ¶¶4-6; Supplemental Affidavit of Annette Fabozzi at ¶¶3-6. However, Ms. Fabozzi was well aware that Welsh was only an "insurance broker," Affidavit of Annette Fabozzi at ¶ 4; Supplemental Affidavit of Annette Fabozzi at ¶ 3, and should have known that neither Fran nor Welsh was in a position to decide whether to pay the claim. Ms. Fabozzi's own affidavits suggest that Fran was merely attempting to placate an upset customer by resorting to platitudes, such as "Lexington is a good company." Supplemental Affidavit of Annette Fabozzi at ¶ 5. Indeed, when Ms. Fabozzi inquired about the status of her claim in May 2003, Fran apparently could not answer without "check[ing] into it,"

15

and then told Ms. Fabozzi that "they" – not we – were "still working on it." *Id*. at ¶ 6. Accordingly, Ms. Fabozzi either knew or should have known that she could not rely on assurances from Fran or Welsh.

Even if Plaintiffs were misled by Fran's assurances in 2002 and 2003, Mr. Fabozzi's deposition on January 7, 2004, should have been enough to disabuse them of the notion that Lexington was prepared to pay their claim. Lexington's counsel questioned Mr. Fabozzi extensively about when he first discovered the damage to the property, asking questions which suggested Lexington's belief that Mr. Fabozzi had not given prompt notification of the damage. In addition, Lexington's counsel made frequent references to Mr. Businelli's June 21, 2002, letter to Mr. Barbieri – a letter which expressed the architect's belief that the house had been built without a proper pile foundation. In light of these facts and the adversarial tenor of the deposition, Plaintiffs and their lawyer could not have reasonably believed that Lexington was likely to pay their claim, regardless of what assurances Plaintiffs may have previously received.

## *CONCLUSION*

For the reasons set forth above, this Court concludes that the instant action is barred by the two-year time limitation set forth in the Policy. Accordingly, Defendant's motion for summary judgment is granted and this action is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
January 8, 2009

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge

16